UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LYNETTE ECKSTEIN,

        Plaintiff,

v.                                       Case No. 13-C-831

CAROLYN COLVIN,

        Defendant.

**DECISION AND ORDER**

Plaintiff filed this action challenging the decision of the Commissioner of Social Security denying her disability benefits. For the reasons given below, the decision of the Commissioner will be affirmed.

**I. Background**

Plaintiff Lynette Eckstein applied for disability benefits in 2006, but was rejected because she had not accumulated enough work history to be eligible. Eventually she found work at a family business called Valley Vinyl, where she was allowed to work with the option of sitting or standing at will. While there, she had an assembly line position that usually involved holding a hose while another employee sprayed a coating onto products. (Tr. 38.) She worked six or seven hours a day but lost the job due to downsizing in 2008. (Tr. 40.) For part of that time, she also worked a part-time night job doing janitorial work, but had to quit because it was hard for her to lift the industrial mop. (Tr. 40.) Eventually she started working at Burger King 10 to 20 hours per week, which required her to be on her feet the whole time. She became eligible for disability benefits in January

2010.

Plaintiff's limitations primarily involve her back, dating to at least the mid-1990's, when she began seeing a chiropractor. In 1998 she complained of severe lower back pain and loss of bladder control (Tr. 226-27), and underwent an MRI that revealed disk herniations at L4-5. (Tr. 228.) Plaintiff had surgery, followed by another surgery in 1999. In the ensuing years she received treatment when she experienced additional pain, often the result of being more active. (Tr. 240.) Treatment notes regularly note Plaintiff's aversion to taking medication, including ibuprofen, which providers thought would help with inflammation and pain. (*Id.*)

In 2003 Plaintiff had another MRI and sought consultation with Dr. Mann for possible surgery. She returned to Dr. Mann in 2005 for lower back pain, who scheduled an MRI that Plaintiff apparently cancelled on her own. (Tr. 254.) Plaintiff also had normal EMG studies done in 2005. (Tr. 245.) Between 2005 and 2010 there is a gap in treatment, with Plaintiff ultimately visiting Dr. Green, a family practitioner, in January 2010 (her disability eligibility date) for lower back pain. Dr. Green noted that Plaintiff was working in order to obtain enough credits to qualify for disability, but that after four hours of work "her legs are pretty numb and hot and burning when she goes home." (Tr. 283.) (At the time, she was working on her feet at Burger King.) Dr. Green also noted that the lower back pain might be controlled better with Lyrica, an anti-convulsant that is also used to control nerve pain, but that Plaintiff declined to take that drug. She did try a "burst and taper" of steroids, however. (Tr. 284.)

In May 2010 Dr. Johnson evaluated Plaintiff for the Disability Determination Bureau. Dr. Johnson noted Plaintiff's back pain, as well as her problems with bladder control that required her to wear an absorptive pad at all times. (Tr. 291.) Plaintiff testified that she did not drink much

2

liquid during work because it could cause her to immediately lose control of her bladder. (Tr. 53.)

In January 2012 Plaintiff saw Pamela Netzer, a nurse prescriber, for a follow-up after appearing at urgent care the previous week due to back pain. (Tr. 327.) The back pain arose soon after a fall and exacerbated her problems, which required a break from working at Burger King. Netzer noted that Plaintiff's pain was a "5" and that she had difficulty getting into and out of a chair. (Tr. 328.) In addition, Plaintiff was using a cane to aid with balance while walking. By the time of a January 18, 2012 follow-up, however, Plaintiff was "definitely better" with pain at "about 3-4" and "walking easier and she is much more comfortable." (Tr. 325.) "She definitely feels she is mending." (*Id.*) Plaintiff was then allowed to return to work, albeit with the restrictions that she should not twist or lift more than 10 pounds. (Tr. 326.) During this period Plaintiff was also undergoing physical therapy and was doing exercises for her lower back. She eventually reported pain at a level of 1-2 out of 10, and the therapist noted that "patient made good progress in therapy and overall was doing well with home exercise program. At last visit, the patient stated she felt like she was close to her baseline and was ready for discharge." (Tr. 334.)

Plaintiff tried to return to work at Burger King but the company did not accommodate her restrictions. Thus, after improving during physical therapy, Plaintiff returned to Nurse Netzer and obtained permission to return to work without restrictions, except that she should not work shifts more than four hours for two weeks. (Tr. 338.) Netzer noted that "she definitely feels improved" and is "a lot better" with pain at a 3 "when she gets it." (Tr. 337.)

**II. Analysis**

The Commissioner's final decision will be upheld if the ALJ applied the correct legal

3

standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir.2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.2007).

**A. ALJ's "Logical Bridge" for Residual Functional Capacity**

The ALJ found that Plaintiff had the residual functional capacity to perform sedentary work with the ability to sit for six hours, stand or walk for two hours, with an option for sitting or standing as needed. (Tr. 25.) Plaintiff suggests a number of reasons why the ALJ's conclusion was not supported by substantial evidence.

**1. DDS Determinations**

Plaintiff first argues that the ALJ relied on non-existent state agency assessments that concluded she could perform sedentary work. Specifically, the ALJ found that DDS (Disability Determination Service) "assessed the claimant as capable of a reduced range of sedentary work" (Tr. 26), but Plaintiff argues that there were no DDS assessments in the record at all. After the Defendant pointed out that there were in fact *two* DDS assessments in the file, Plaintiff changed her argument and now asserts that the DDS reports are not reliable because they were not signed. Instead of an actual or electronic signature, she notes, the signature blocks contain the typed names of the physicians issuing the report. (Tr. 69, 80.)

Plaintiff has waived this argument by not raising it in her initial brief. In fact, the reports she now complains about were issued a year and one-half before her hearing. A reply brief in an action for judicial review in the district court is certainly not the proper place to raise such an argument for the first time. In any event, Plaintiff has not cited any authority requiring an ALJ to

4

disregard DDS reports simply because they have typed signatures. It is true that *prior* internal procedures of the SSA may have required an actual signature, but "on June 8, 2009, an amendment to POMS DI 26510.089 § A.4 (as amended) allows MCs and PCs to electronically sign forms. Thus . . . when the ALJ issued his decision, electronic signatures were acceptable to authenticate a document." *Tritz v. Astrue,* 2011 WL 3737232, 10 (E. D. Wis. 2011). Notably, many district courts (including this one) rely on typed signatures rather than actual "wet" signatures or other, more elaborate, forms of electronic signing. Thus, the fact that the reports are not physically signed does not mean the ALJ should have ignored them.

**2. Sit / Stand**

The ALJ went beyond the state agency reviewers (who found Plaintiff could perform sedentary work) and imposed a sit-stand option, which would allow the Plaintiff to sit and stand at her own discretion, which she had done successfully while working nearly full-time at Valley Vinyl. The Plaintiff takes issue with this, noting that the ALJ did not specify the frequency with which the Plaintiff would be able to sit or stand. But the very nature of a sit-stand "option," which is what the ALJ imposed (Tr. 58), is that it is subject to the claimant's own discretion on an as-needed basis.

It is true that in some cases more specificity might be required.[1] There are some individuals

---

[1] The regulations, SSR 96-9p, 1996 WL 374185 at *7, provide as follows:
Alternate sitting and standing: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

5

who might be able to work a sedentary job so long as they had the ability to stand up and stretch for just five minutes every hour. An ALJ imposing such a specific restriction should be specific in his question to the vocational expert, primarily because the extent of the need for positional change could be relevant to the number of jobs available. By contrast, when the sit-stand option is essentially unlimited and left to the claimant's discretion—meaning that the claimant could sit for 55 minutes or only 5, depending on how she felt—that is a *broader* limitation that is essentially unlimited. When such a limitation is imposed, it does not make sense to require more "specificity" because the decision to sit or stand is up to the claimant. The VE is essentially being asked to assume an unlimited frequency of changing between sitting and standing, and that is sufficiently specific. *Ketelboeter v. Astrue,* 550 F.3d 620, 626 (7th Cir. 2008) ("Changing positions 'as needed' allows an employee broad flexibility and thus has a more restrictive effect on the jobs available to him than the limitation Ketelboeter thinks the ALJ should have described.")

### 3. Incontinence and Cane

Plaintiff also argues that remand is required because the ALJ did not address Plaintiff's bladder control issues in determining that she had the RFC to perform sedentary work with restrictions. Although it is true that the ALJ did not address bladder issues, it is also true that there is no evidence in the record that would support imposing a limitation due to such issues. Dr. Foster, a state agency reviewer, noted her bladder problems but nevertheless found Plaintiff able to perform sedentary work. (Tr. 73, 76.) And Plaintiff's own testimony was devoid of any suggestion that her problems had interfered with her ability to work at any of her past jobs. She stated that to accommodate her problem she avoided coffee and water while working and wore a pad. She was able to work at Burger King and worked nearly full-time at Valley Vinyl (6-7 hours a day) without

6

apparent incident.

Plaintiff also argues the ALJ should have considered her use of a cane, which Plaintiff used especially in winter months when it was icy. Plaintiff does not explain how the use of a cane in icy (outdoor) weather would impact her ability to work at the hundreds of sedentary (indoor) jobs such as production worker, production inspector, or surveillance monitor, which the VE testified about. Even if Plaintiff occasionally used a cane indoors, it would not impact her ability to perform those jobs, all of which are sedentary with a sit-stand option. Thus, it is unclear why the ALJ should have discussed Plaintiff's intermittent use of a cane.

## B. Credibility

The ALJ found the Plaintiff not fully credible for a number of reasons. First, the ALJ noted that Plaintiff had gone back to work in an attempt to build up enough credits to be eligible for disability benefits. This, the ALJ found, undercut Plaintiff's credibility because it demonstrated the Plaintiff was able to work. The ALJ also noted that Plaintiff often did not take medications for her back pain, and specifically that she refused to take Lyrica. (Tr. 284.) This suggests that the pain is perhaps not as disabling as alleged. In addition, Plaintiff cancelled an MRI after getting better (Tr. 254), and there were very few treatment records around the time of the alleged onset date. The ALJ ultimately concluded that these factors undermined the Plaintiff's credibility regarding the disabling nature of her back pain. Notably, however, the ALJ did credit the Plaintiff's testimony that she could not work full-time in a job like she had at Burger King, where being on her feet for four hours caused burning sensations and pain. Accordingly, as discussed above, the ALJ imposed a sit-stand option that would allow the Plaintiff to sit or stand as needed.

An ALJ's credibility determination is entitled to deference, and will be overturned only if

it is "patently wrong." *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013). Courts are not allowed to reweigh the facts or reconsider the evidence. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). But when a credibility finding rests on "objective factors or fundamental implausibilities," rather than on a claimant's demeanor or other subjective factors, we have greater leeway to evaluate the ALJ's determination. *Schomas v. Colvin,* 732 F.3d 702, 708 (7th Cir. 2013).

The reasons cited by the ALJ were sound. Plaintiff notes that she did take steroid injections for her back pain, and thus suggests that it was error to point out that she refused to take Lyrica. But Dr. Green's treatment recommendation was for steroids *and* Lyrica, not either-or. (Tr. 284.) They are completely separate treatments. Thus, the ALJ was entitled to make note of the fact that Plaintiff did not avail herself of all the treatment that was available and suggested to her by medical professionals. Although not dispositive of the credibility finding, a failure to follow a recommended course of treatment—without any reason provided apart than a general dislike of taking medication—tends to show that the problem complained of might not be as severe as alleged because most people with crippling pain go to great lengths to alleviate that pain.

Similarly, the ALJ was entitled to view Plaintiff's continued work as undercutting her claim of disability. First, this factor was quite a small component of the credibility finding, because the ALJ actually credited Plaintiff's testimony that she would not be able to work full-time at a job like Burger King. It is true that continuing to work does not outright preclude a disability claim, because in some cases claimants undertake extreme efforts or suffer severe pain just to put food on the table; they might have no other choice, or they might overestimate their abilities. But here that does not appear to be the case, partly because Plaintiff's husband was gainfully employed, and mostly because there is no indication that Plaintiff was going to heroic lengths in order to work. In fact

8

there is no indication that Plaintiff experienced significant problems while working at Valley Vinyl, which had a sit-stand option. She left that job because the company lost a large client, not because she could not take it anymore. As with almost any credibility determination, the cited reasons for discounting credibility are not individually dispositive. Instead, they create a broader picture of the claimant's behavior and abilities, and here the ALJ was not patently wrong in citing the factors discussed above. It is perhaps worth noting that although the ALJ cited these factors in discounting Plaintiff's credibility, this is not a typical case where credibility played a large role. Instead, the determination of no disability appears to arise largely from the fact that Plaintiff was able to work six or seven hours at Valley Vinyl, and those hours were determined not by her abilities but by the needs of the company. In other words, she appeared perfectly able to work full-time with a sit-stand option. An exchange between Plaintiff and the ALJ is telling:

> Q Now, during these years that you were not working, what would've kept you from doing a job where you could just sit down?
> A Because if I sit too long then I start to get a lot of pain in my back.
> Q What would've kept you from doing a job where you could sit or stand as you needed to?
> A I've never found one that I could do that.
> Q Is that what you were doing at Valley Vinyl?
> A Yes, they did it where I could sit or stand.

(Tr. 43.)

In short, Plaintiff appears to concede that if sit-stand sedentary jobs were available, she could perform them. Thus, unlike many cases, the ALJ did not need to rest her decision on credibility but on the fact that Plaintiff effectively conceded that she could work with a sit-stand option, as she had at Valley Vinyl. Plaintiff does not question the VE's conclusion that such jobs exist. In sum, although the factors the ALJ cited on the credibility issue are reasonable, it appears likely that the

9

disability determination did not turn on credibility to any material extent.

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is **AFFIRMED**.

**SO ORDERED** this 16th day of September, 2014.

                                                       /s William C. Griesbach
                                                  William C. Griesbach, Chief Judge
                                                  United States District Court